And we'll call the next case the Government of the Virgin Islands v. Oswald Mills. Mr. DiRusso. Good morning, Your Honors. I'm pleased to report Joseph DiRusso on behalf of the appellant Oswald Mills would like to reserve five minutes for rebuttal. That request will be granted. Your Honors, this case comes before you on an appeal from a decision of the Appellate Court of the District Court of the Virgin Islands. Make sure you speak loud enough into that microphone. Yes, sir. It comes to you before you on an appeal from the Appellate Division of the District Court of the Virgin Islands, which in turn reviewed the decision of the Superior Court. The criminal case below found my client guilty of, among other things, first-degree murder. On appeal, and given my limited time before you today, I'd like to focus on the first and the third arguments I present in my opening brief. Okay. Let me ask you a preliminary question. Yes, sir. I have reviewed the transcript of what the instruction the judge gave to the jury. Has the judgment asked if, in fact, that is what he said to the jury? Because the language in the transcript is not good. It doesn't make sense. There's six in there, and it doesn't read appropriately. And because objective and subjective could easily be mixed up by a court reporter, I was just wondering if anyone had asked the judge what he actually said. Did he say objective or subjective? No, I don't believe there's anything in the record. And the record before the Appellate Division, the jury ---- Were you the trial counsel? No, I was not the trial counsel. This was a trial in 2002. I was appointed by this court recently. What I would say is the jury instruction, we believe, is defective, and I don't believe that it was a typographical error or a one-off mistake. If I could turn the Court's attention to Joint Appendix, page 830, I believe the language I'm quoting here, starting at line 8, the circumstances under which a defendant acted must have been such to produce in the mind of a reasonable, prudent person similarly situated the reasonable belief that the other person was about to kill him or to do him serious bodily harm. Now, that is a jury instruction that preceded the one which I believe really focused the jury's attention. And that was on Joint Appendix, page 834. And that one says, and I'm quoting here, starting on line 8, quote, the defense hinges on the defendant's objective belief in an imminent danger of death or serious bodily harm are not on the objective reasonableness of the belief. Now, Mr. DeRusso, we have to look at the instruction as a whole. In general, yes. Well, not in general. Those are the rules. We need to look at the instruction as a whole. And I can look at, I think, four prior places, mainly before 834, where the Court said something like this. If the defendant was not the aggressor and had reasonable grounds to believe and actually did believe he was in imminent danger of death or serious bodily harm, doesn't those words convey both the subjective and objective tests that the Virgin Islands has said are the test, the proper instruction for self-defense? Admittedly, yes. However. So it's said at least four times prior to the mistake. Second, notwithstanding the question maybe Judge Roth has raised about the actual transcript, there is a mistake on page 834. And on page 830. It's not a one-off mistake. And the reason why this is important, Judge, is this. If I could draw an analogy to being back in college, right? When the professor is up there talking, giving a lecture, and he's telling you, the students, about the subject matter. And then the professor says, now this is going to be on the test. As a student, I was like, ding, ding, ding. I'm going to listen. I'm going to focus in on what he's about to say. And here, when the trial judge says the defense hinges on, he is focusing on, notwithstanding what may have happened earlier, he is focusing the jury's attention, what hinged on. And to me, that articulates the succinct test for the jury to then apply the facts of the case. But, Mr. Durso, on page 830, which you point us to, the very next sentence after articulating the objective test is, in addition, the defendant must have actually believed he was in imminent danger of death or serious bodily harm, and the deadly force must have been used to repel that force. That's true. So, yes, there's a statement of the requirement of objective or reasonable belief, but the district court went on to state very clearly that there's an additional requirement of actual, that is, subjective belief. The Superior Court did it, yes, the trial court. Thank you. So why, under those circumstances, when we do have the obligation to review the instructions as a whole, and we see statements like this repeated throughout the jury instructions, why should we find that there was error in these instructions? Well, looking, taking what was said before, before being the defective jury instruction, you have, at a minimum, an inconsistency between what was said before and what was said prior. The objective, a strictly objective test versus a subjective and an objective component. So looking at the jury instruction, if we're going to look at it as a whole, I don't believe that a jury would be able to discern, based upon the subsequent, the final instruction from the trial court, where it hinges upon merely an objective test. I'd like, unless my colleagues have questions on this, I'd like to turn to the issue of prosecutorial misconduct. Let me just, if I could, let me just ask one other question along this line. You allude in your brief to an argument that the instruction as being discussed here was defective and therefore eliminated the jury's opportunity to find that this was an imperfect defense and consequently find voluntary manslaughter. And that's a constitutional important, I believe, under United States rule. Okay. But where is that fault in the instruction? I don't see that. You make an interesting argument because, you know, some could look at this and say, well, this looks like a voluntary manslaughter case. Absolutely. With a 10 to 20 year sentence as opposed to a life sentence. Exactly. But where in the instructions do you see that fault? Was there a lesser included offense included in the instructions? No. In the jury instructions themselves, there was not a lesser included offense. And the problem that we have, and I admit, this is, the record is what the record is, the charging conference, in other words, the dialogue between the attorneys outside of the presence of the jury, was not transcribed, which is a common occurrence in the British Islands. So I have no idea if trial counsel actually asked for a lesser included offense of manslaughter, voluntary or otherwise. But we do know from joint appendix at 716 that counsel actually objected to the, even the inclusion of the instruction for a lesser included offense of second degree murder and attempted murder. So that makes it seem quite unlikely, particularly in the absence of any evidence that an imperfect self-defense or manslaughter instruction was requested, that that actually happened, doesn't it? Unlikely, yes. If I was a wagering man, I would say probably, the trial counsel probably did not do it. It's my experience that the requests for lessers included in the Virgin Islands and trial counsel often don't do it, whereas in other jurisdictions where I practice it, it's a little more common. All right. One quick question, too. Is there a Virgin Islands case recognizing imperfect self-defense, recognizing that as a valid plea to get away from first degree murder problems? I can't represent to the Court that I've ever seen a Virgin Islands case either before this Court or the B.I. Supreme Court which discusses imperfect self-defense, although I would submit that as a matter of basic U.S. common law. That's a pretty standard black letter thing that we have. Mr. DeRuzo, did you represent Mr. Mills before the appellate panel? No, I did not. That was Mr. Brush, who has been subsequently disbarred. Mr. who? Mr. Brush, who was subsequently disbarred. Okay. And an interesting question. If something is not raised before the appellate panel and then you are here before us, do we review the failure to raise that as waiver or plein air? Okay. If appellate counsel before the appellate division doesn't raise a particular issue, like Miranda, for example, I would submit that there probably would be a two-step analysis. The Court would have to engage in a waiver analysis, then would have to look through the decision below since this is, in effect, a general review of the decision using the appropriate standard as if this Court were sitting at an appeals level in the first instance, and then engage in a plein air analysis. All right. I'm going to give you some additional time. We'll give you three minutes additional time to delve into the question that Judge Cross raised. Turning to prosecutorial misconduct? Yes. And before we go into the merits of it, and I'd like to get the government's views on this as well, how should we think about where we place the issue of the strength of the evidence when we're considering the due process analysis or is it a harmless error analysis? In other words, in Berrios, we said we look at the prosecutor's offensive actions in context. We assess the severity of the conduct, effect of curative instructions, and the quantum of evidence. So strength of the evidence seems to factor into a due process analysis. In Marshall v. Hendricks, we talked about conducting a due process analysis and then turning to a harmless error analysis. What do you submit is the right way for us to think about the strength of the evidence issue? Candidly, my initial reaction is probably going to be the same analysis of a Strickland analysis. Given a Strickland analysis, a two-pronged analysis, the Court can go to either prong, whichever is easiest to dispose of first. I think perhaps that that same logic would apply here. Assuming one prong was dispositive and the Court would say there's just not enough here, the prosecutor's conduct doesn't really, there's not a whole lot there, and it didn't rise to that much, a one-off comment with a subsequent curative instruction in the course of the trial, not a big deal, you can dispose of it there. So I think conceptually that would allow the Court to dispose of it that way. Well, we have here some pretty significant potential misconduct that we'll be talking about with the government shortly. I would submit this is probably the worst I've ever seen. How do we factor in then the strength of the evidence here, which is also substantial? Well, Your Honors, I actually don't think the strength is substantial, because this is, one, the jury acquitted my client of count four. Two, this is a prototypical he said, she said case. There's not videotape evidence. This is, you know, did my client, you know, act in self-defense? Yes or no? There's only one person, the decedent's wife, that was witness to the entire event, unlike being in front of an entire crowd. So I would submit that no DNA evidence, not like a DNA evidence or forensics evidence would apply in this case, but it's strictly a he said, she said. Well, there's a second witness that hears the argument. There's the issues of his flight, evasive conduct, and false statements that he gives upon his arrest. And the explanation he gives, which a reasonable jury might find was not credible. They might. And their phone records too, aren't they? I don't believe that. No, sorry. Another case, sorry. So I would submit that while it's not overwhelming evidence against my client, and then you probably have to have a sliding scale between the weight of the evidence against my client and the egregiousness of the offense of prostitution or misconduct. And when you have a sliding scale, I think in this case, based on there's no place like home, there are little children out there who might get this gun. Let me show the picture up there, and they never referred to it. And candidly, amazingly, the prosecutor admitted that it was there, nothing more than to provoke sympathy. Now, that picture had already been admitted into evidence, had it not? Yes, it had. So what's wrong with showing it? Showing it, nothing wrong with it. Sticking it up there during the duration of a closing argument, not making reference to it. And then when the trial judge says, what was the purpose of that? You never used it. And the prosecutor admits it was there only to provoke sympathy. Can you identify for us which exhibit that was? Do you know whether it was exhibit 11 or it's just referred to as an autopsy photo? Unfortunately not. I couldn't glean that information from the record from what I have given to me. Perhaps the government will have that information for us. Or perhaps. But I look forward to speaking to you on rebuttal. All right, we'll have you back on rebuttal. Ms. Walker. May it please the Court, good morning. Good morning, Ms. Walker. And keep your voice up, that microphone tends to lean one direction and counsels seem to always come this direction. Okay, I will lean with the mic. Good morning again. The government submits that the appellate division was correct in their determination that the trial court should be affirmed. Speaking to the jury instructions, the government agrees that the court should review it in its totality. The government submits that the court should review it in its totality. It was just a potential misstatement by the judge. We do not have the actual jury instructions used by the judge back in 2002. The government hopes that this court will see the error, if there is an error, which we don't find it to really be an error. We don't think that the misstatement, the misuse of this word, rises to the level that it should be remanded or that the case should be reversed. You know, Mr. DeRusso points to not only the misstatement, but the lead-in, which says that the defense hinges. In other words, this is it. If the jurors are like students and they just perked up and they listened to what the court said, the use of the word objective belief would certainly have the potential to throw the jurors off on the wrong track on something that clearly was the sole defense. There was nothing else that Mr. Mills attempted to show in this case. Judge Fisher, we agree that it could potentially distract the jurors, but there were six pages worth of instructions just on this element. We also would submit that it's our hope that the jury would be paying attention the entire time, and one word may not jump out, but the entire instructions as a whole give them a command of the basic law so that they can apply it. The jurors were there. We weren't. And it's a hope of the process that the jury would be paying attention from beginning to end, the entire trial, as well as the entire final instructions. Six pages worth of jury instructions we submit is substantial to get the relevant point across. Ms. Walker, we have here three very serious errors in the way the prosecutor appears to have conducted this prosecution, starting with statements in the opening, not simply referencing home or the fact that the victim was killed in front of the home, but speaking in the first person plural to the jury and saying we got to be safe at our homes. We got to stop these Oswald Mills from coming to our home and ruining our lives. We have to be safe at our homes repeatedly. How is this kind of suggestion that the jurors should fear this defendant and need to have him locked up to be safe in their own homes, not misconduct? Judge Krause, if I were the one doing it, I may not use such strong language. The prosecutor was being very, very aggressive. That's apparent from the record. That's simply improper, isn't it? Your Honor, I— I mean, you may argue that it's harmless, but surely you're not arguing that this was a legitimate thematic device to reach out to the jurors and suggest that they need to lock this person up so they can be safe in their own homes. Your Honor, yes, I agree. Another line, another theme could have been used, but the government holds that although this was stated, there were curative instructions from the judge. We can talk about that, too, but let's talk about the second error because I don't see where, if at all, this is addressed in your brief, and that is the repeated statements that this gun was left in the area of not one, but two schools, two schools where innocent little kids walk and travel that path. They live in that area. They travel all the time. What if one of them finds that gun that he so casually threw away? What if one of them accidentally shoots their friends? What was the defendant here being tried for, right? I mean, as you read these kinds of statements, it doesn't seem like we're talking about the murder of the victim. These are unrelated kinds of allegations that are now being made, right? Your Honor, I would say that the trial judge gave thorough instructions. Do you agree that that is also error? I would say that if it is error, if you find that it is error, it would be harmless error. Do you agree that it's error? No, Your Honor. I wouldn't put the prosecutor out there like that. I was not the prosecutor. Is it your office's position that in a murder trial that it's appropriate for the prosecutor to make reference to innocent schoolchildren who might happen to find a gun and shoot their friends? Your Honor, I do think it's inflammatory. I do think that it directs the jury. But my office would report that if it were error, if you find it to be error, it would be harmless in the totality of the trial, of the active participation by trial counsel, the active participation of the trial judge to identify that these things could influence the jurors. So he gave the instructions that evidence is only what was testified to and submitted by the court, not the individual opinions of the prosecutor or trial counsel. Unless I missed it, I don't see anywhere in your brief that the government is disputing that this was error and not harmless error. There's no reference to the alleged misconduct about the statements of the gun near the school. Shouldn't we then consider that conceded by the government? Your Honor, honestly, we aren't conceding that. If it were not included, it was an oversight by my office. We don't concede that it was error. What we would submit is it would be harmless error, if any error at all. The totality of the record here that we need to consider also includes what happened in closing. Separate from the statements about we need to be safe at our homes and the innocent schoolchildren, the record reflects that there was a gruesome autopsy photo that was displayed to the jury for the entirety of the closing, even through rebuttal. Do you know which exhibit that was? Your Honor, I do not. My record, after all these years, this prosecutor has since passed away. So I don't have access to his notes or anything like that. But I could do additional investigation if you would like and submit that to you. I appreciate that. This prosecutor candidly, when he was asked by the district court about why this photo was put up, with the district court remarking that it was distracting, that the jurors were looking up there, they were watching that rather than the argument they should be listening to. And when he asked the prosecutor the purpose, the prosecutor states very candidly that it was a strategy to provoke sympathy. That, the government conceives, is improper purpose for showing a photo, correct? Correct. And here the district court reflects in his statement, whichever photo it was, that the prosecutor picked the photo that's going to provoke the most sympathy and calls it a gruesome autopsy photo. When we look at the totality of the circumstances and we look at our case law that describes the range of when prosecutorial misconduct in combination is harmless versus when it is so prejudicial to deny someone a fair trial, doesn't this fall on the side of Moore, that it is a violation of due process, rather than Berrios, that it's not? I would summon that it does not. First of all, the photo was already entered into evidence. They would have it in the back. They could ponder over it while they're deliberating. They could circulate it, look at it multiple times. The evidence shows that although counsel is categorizing it as a he said, she said, there was testimony by the defendant's wife, his brother, police officers that interacted with the defendant immediately after the incident. I think that looking at everything on a whole, these items that you highlight do not push the scale in that direction, no. I'm not commenting in any way on how the panel is going to decide this case, but whatever the decision is, I think it would be helpful to pass on to your office that inflammatory language of this nature is improper by a prosecutor's office. Noted. What was your answer to that? Noted. Noted. Okay. Thank you. And the question I would have, Ms. Walker, in this case, there was no testimony in the record as to motive, was there? No, Your Honor. And there was no testimony as to, was there any testimony as to whether Mr. Clement had a gun or owned a gun? There was no testimony from, say, the government stating that he had a license for a gun or anything. Okay. There was no testimony that the gun may have been Clement's as opposed to being Mills' gun? Outside of Mr. Mills, no. Outside of Mr. Mills' testimony, no. Okay. And Mr. Mills said it was Clement's gun. Okay. So it just seems to me here that on the evidence of guilt that you argue, and it's easy to argue that you have looked at totality and that the misconduct, even if it was there, it was harmless there, that's easy to argue. But in this case, this seems to be a pretty close case as to whether or not this wasn't just a fight. And generally fights are not found to be, deaths in the midst of fights are not found to be first degree murder, but a lesser degree of murder. And you couple that with the fact that there's at least some question about the propriety of the jury instruction on self-defense, together with three separate pieces of potential prosecutorial misconduct. This isn't really an overwhelming case, is it? Your Honor, the government would submit that the evidence was reviewed by the jury that sat there, that got to see the emotions and the reactions of the defendant, which is often hard to glean from the trial transcript. And the process allows for the jury to decide the case. The jury found that he was guilty, and we submit that and encourage the court to review it as a whole. Any error that you might find was harmless, there was substantial evidence from his testimony being rather shaky, the testimony of the decedent's wife, her brother, the taxi driver that saw him immediately hiding in the bushes, all those different things put together, a reasonable jury could find that he was guilty. Following on Judge Fisher's question, where we have here, it's not a question of whether he was involved in the shooting. This is a case about self-defense. He took the stand, he put on a self-defense defense. So his credibility is the central issue there. Under those circumstances, shouldn't we be even more concerned about misconduct that is directed to juror sympathy, that is asking the jurors to make a decision based on emotion and not on the facts in the record? I think that would be a fair consideration for the court. But based on the record, we have a trial judge who was very active and aware of what was happening, and he gave instructions that validly and were thorough enough to redirect and focus the jury on what their task was, which was to follow the law based on the evidence that was presented. Let me ask you another question, Ms. Walker, and it's one that Mr. DeRuzzo didn't cover. But we have to review this case with a more deferential standard because of the lack of objections. So we have a plein air level review, and that standard is very difficult for the appellant to meet at times. Is the record here sufficient enough for us to make a determination on point two, on ineffective assistance of counsel? We submit that the trial counsel was very effective. I know that. But is the record sufficient for us to make a determination, particularly as to the deficient performance problem? Yes, Your Honor. It was an extensive trial transcript that you could review all of what happened. If the court does want background thoughts by the trial counsel, then it's not. But based on the base of what we have, we do think it's sufficient. Okay. Thank you. Ms. Walker, thank you very much. Mr. DeRuzzo. In my brief, I make reference to the Golden Rule, and the Golden Rule is pretty common in case law in Florida and the Eleventh Circuit, and I even cited a fourth circuit case. But in my research coming today, I couldn't find anything in this court referring to the Golden Rule, but I really think the Golden Rule hits it on its head. The Golden Rule stands for the proposition that the prosecutor can't ask the jury to imagine what the victim felt, what it was like to be the victim, nor can the prosecutor ask the jury that they should have, in essence, convict because if they let the defendant off, they could be a future victim. And that's basically what happened here. We have repeated references to there's no place like home, even in the opening that Judge Krause referenced, saying that we have to protect ourselves, this community, from my client. You've layered that together with the references to the children, and I submit that St. Thomas is a small island, 60,000 people on that island, and there's a very high likelihood that members of the jury had children who went to one of those two schools or who had a relative, a niece, a nephew, a cousin, a grandchild that went to one of those two schools. So as a result, you've layered the Golden Rule violation on top of the reference to the children, and I think that pushed the bar from permissible over to impermissible, and this court should reverse. I would submit that as far back as 1995, when the United States v. Bentham Court, which is noted at footnote 8 in my opening brief, where now Chief Judge McKee noticed and observed how often these issues of prosecutorial misconduct were coming before the court. Now, it's been a long time since 1995, and I won't represent that I've taken the time to review all the court's criminal cases post-1995, but I have a good belief that cases of prosecutorial misconduct are coming before this court, they're coming before other courts, state courts, territorial courts, with far too great a frequency. And I would implore this court to perhaps send a statement, not only in this case to remand for a new trial, but let the prosecutors know in general that this type of behavior, this type of conduct, it's not acceptable. And if the prosecutors don't know that it's not acceptable to do these kind of things in trial before a jury on a first-degree murder case, perhaps they shouldn't be trying cases. And I don't think it's too much for this court to let prosecutors put them on notice that this is not acceptable. Mr. Frum. Mr. Drew, so can you anchor this in our case law? In Berrios, there was also the presentation of a photo, a puzzle of the victim that was put together, and there was the reading of a commemorative poem, things that were found to be misconduct, they were error, yet given the instructions and given that particular evidence and how briefly it was shown to the jury, it was determined to be harmless. Why isn't this case more like Berrios, given that we do have some instructions from the district court that the jury should decide the case on the facts and not on bias or sympathy? Well, Your Honor, last night in preparing for oral argument, I just went through the openings and the closings. And here's my take on either a golden rule violation or a reference to children. I find it on Joint Appendix pages 163, 164, 165, 166, 167, 171, 172, returning to closing, 727, 734, 799, and then 801 regarding the admission that the picture was there with nothing more to do with the jury's sympathy. This was the theme. The theme, as you noted, first of the words, have the prosecutors now, where it's 3.40 in the afternoon and there's no place like home, home sweet home, the reference to Wizard of Oz. This is not a fleeting reference within the context of a two-week conspiracy case with eight criminal defendants and co-defendants. This is a one-person criminal case where the heirs started at the beginning of the opening, proceeded during the duration of the evidence in the government's case-in-chief, and continued through closing. So to the extent that there are cases that this court has determined don't rise to that level, I will submit those cases stand with the proposition where they're fleeting, they're one-off, and with their curative instructions, that's not enough. In this case, there weren't any curative instructions. So contrary to my opposing colleague's comments, the trial judge wasn't active. I don't have a sua sponte reference or instruction to the jury by the trial court saying that's improper, you shouldn't consider that. No curative instruction was placed before the jury during the context of the trial. The only type of curative instruction which I don't really believe qualifies is when the trial judge says you're only supposed to consider the evidence. Well, that's a standard instruction that's in every case. That is not a curative instruction by my definition. So I would submit that based upon the record before this court, based on the law, that the court should reverse the decision below and remand for a new trial. Thank you. Thank you. Thank you, Mr. DeRuzo. And thank you, Ms. Walker, for a case that was very well argued. And thank you, Mr. DeRuzo, for your representation of Mr. Mills as a CJA attorney. And we will take the matter under adjournment.